2025 IL App (3d) 240514

Opinion filed November 18, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE STATE OF NORTH DAKOTA, d/b/a | ) | Appeal from the Circuit Court |
| Bank of North Dakota, By and Through | ) | of the 18th Judicial Circuit, |
| Student Loans of North Dakota, | ) | Du Page County, Illinois. |
| | ) | |
| Plaintiff-Appellee, | ) | Appeal No. 3-24-0514 |
| | ) | Circuit No. 22-LA-258 |
| v. | ) | |
| | ) | Honorable |
| RENEE PRINCE, | ) | Neal W. Cerne, |
| | ) | Judge, Presiding. |
| Defendant-Appellant. | ) | |

_____

JUSTICE BERTANI delivered the judgment of the court, with opinion.
Presiding Justice Brennan and Justice Hettel concurred in the judgment and opinion.

_____

**OPINION**

¶ 1     This case concerns the treatment of private student loans that defendant, Renee Prince, entered into with plaintiff, the State of North Dakota, doing business as the Bank of North Dakota (Bank), as writings governed by a 10-year statute of limitations under Illinois law, codified under the Code of Civil Procedure (Code) (735 ILCS 5/13-206 (West 2022)). The Bank filed suit against Prince to recover the balance of her loans five and a half years after it declared her in default. Prince argues certain deficiencies within the loan documents disqualify their classification as "writings" within the meaning of the 10-year statute, and as a result, the 5-year limitations period

applies, making the suit brought against her untimely. The circuit court entered judgment in favor of the Bank after a bench trial, holding that the 10-year limitations period attached because the loan documents were "other evidences of indebtedness in writing." *Id.*

¶ 2        On appeal, Prince asserts that the loan documents are not "promissory notes, *** written contracts, or other evidences of indebtedness in writing," as recognized in section 13-206 of the Code. See *id.* The propriety of her appeal depends on whether the circuit court erred in concluding that a document not yet in existence can be incorporated by reference into a writing for purposes of construing section 13-206. If additional documents were appropriately incorporated, a separate issue exists as to whether the documents together possess the "amount in question" element necessary to establish a promise to pay. For the reasons that follow, we affirm.

¶ 3                                        I. BACKGROUND

¶ 4        The following facts adduced from the record and trial are not in dispute.

¶ 5        Between 2001 and 2006, Prince successfully applied for seven private student loans with the Bank to assist in paying for her education at North Dakota State University. Prince never made any payments on the loans. After a period of forbearance, the Bank declared all seven loans in default on August 23, 2016, and filed its action to collect the balance of the loans on March 15, 2022. The sum of her loans amounted to $95,221.

¶ 6        The Bank issued the loans pursuant to the Dakota Education Alternative Loan (DEAL) program, which offered a "supplemental source of loan funds that provide[d] additional financial support to students unable to obtain adequate funds through other student aid programs." The state DEAL loans allowed a student to borrow funds that bridged the gap between federal aid and the remaining cost of his or her education.

¶ 7        Prince's applications were completed on carbon paper, and each application involved an identical three-part process. In the initial step, an applicant filled out information on a written application form that was bound together and included with other documents inside a loan packet. Altogether, the loan packet included 10 pages of information, including instructions on completing the application, a disclosure of terms, the borrower's rights and responsibilities, and a privacy disclosure.

¶ 8        The application itself, a triplicate form entitled "Application and Promissory Note for Dakota Education Alternative Loan" (APN), required the student applicant, as the borrower, to provide personal information, such as citizenship status, references, an address, and a signature. There was a contractual commitment to repay just above the borrower's signature block:

> "Promise to Pay: I promise to pay to the lender, or a subsequent holder of this Promissory Note, all sums disbursed (hereinafter 'loan') under the terms of this Note, plus interest and other fees which may become due as provided in this Note. If I fail to make payments on this Note when due, I will also pay collection costs, not to exceed the minimum allowed under North Dakota State law including court costs and collection fees. I understand I may cancel or reduce the size of any loan by refusing to accept any disbursement that is issued."

¶ 9        The borrower was also required to identify the amount of the loan requested. The reverse side of the triplicate form featured a disclosure of terms that included the following language: "At or before the time of my first disbursement, the lender will send me a disclosure statement identifying additional terms of the loan. Important additional information is also disclosed in the statement of Borrowers Rights and Responsibilities accompanying this Note."

3

¶ 10    The borrower's rights and responsibilities page provided that loan repayment would commence six months after the student left school or fell below half-time enrollment status. Notwithstanding forbearance and deferment periods, the repayment provision provided that "the DEAL loan must be repaid within 10 years." The page also included a provision on interest that stated "[t]he interest rate for this DEAL loan is indicated on the Notice of Loan Guarantee and Disclosure Statement, and will remain a fixed rate until the loan is paid in full."

¶ 11    The student applicant retained one of the triplicate forms and the remaining documentation within the loan packet before forwarding the APN to his or her school for completion of the DEAL loan application process's second part. The school evaluated the difference between a student's federal financial aid and the cost of attendance and would insert that figure within the APN. It would then submit the final triplicate form to the Bank for loan approval.

¶ 12    The DEAL loans at issue are credit based. As such, at the third and final application step, the Bank reviewed the creditworthiness of the student applicant prior to approval. If not able to draw credit from the applicant, the Bank would pull credit from an eligible cosigner after the cosigner completed a separate application, which happened in Prince's case. Once approved, the Bank manually imaged and indexed the APN within the applicant's file.

¶ 13    Once a loan was approved and guaranteed, the Bank sent a second document to the borrower and, if applicable, to the cosigners. This document, system-generated and titled "Notice of Loan Guarantee and Disclosure Statement" (disclosure statement), provided previously undisclosed loan particulars, including the approximate disbursement dates, the sum to be disbursed after accounting for the fees, and the fixed interest rate pertinent to that specific loan. According to the APN packet, the disclosure statement identified the loan amount, disbursement amount, interest rate, administrative fee, grace period, and estimated dates the loan proceeds would

4

be disbursed. While the disclosure statement served as a final notification evidencing loan approval, the loans were not yet disbursed.

¶ 14    Subsequently, a successful loan applicant would receive a system-generated disbursement letter from the Bank, indicating that his or her loans were sent to their school. The letter featured the following language: "Your loan proceeds for this loan have been sent to the above school. The school is required to hold the funds until you are present and enrolled. It is your obligation to keep us informed of any change of enrollment status."

¶ 15    Prince completed this uniform process seven times over. By way of illustration, in her first loan application, Prince requested $7,675 and completed the borrower portion of the APN on July 11, 2001. North Dakota State University's financial aid office completed the school portion of the APN on July 18, 2001, by reviewing the difference between Prince's federal financial assistance and the cost of her attendance and certifying the loan amount she requested.[1] The Bank completed the lender's section on July 25, 2001, approving the loan. The Bank issued the disclosure statement on that date, withdrawing a 4% administrative fee from the $7,675 distribution and listing the loan's 8.25% fixed interest rate. Her loan was later disbursed in two parts, as indicated by September 4, 2001, and January 15, 2022, disbursement letters. For all seven loans, Prince received a disclosure statement anywhere from 9 to 30 days after she submitted her portion of the APN and would receive the disbursement letters months after she submitted the APN. The loan amounts approved by the Bank and thereafter disbursed never exceeded Prince's requested amount.

¶ 16    The collection and recovery manager for the Bank testified that language in the disbursement letters prevented the release of loan funds in the event that a student may not

---

[1]Normally, North Dakota State University would certify the amount Prince requested in the APN. One exception, however, was Prince's sixth loan application, wherein she requested $6,000 but the university only certified $3,574.

5

ultimately enroll. If that were the case, "the school could return the funds back to Bank of North Dakota." Accounting for discrepancies in the interest rates applied to several loans, which were comparatively lower than the rates listed in the disclosure statement, he explained that in 2005 and 2009 the North Dakota state legislature responded to recession by reducing maximum fixed interest rates.

¶ 17    In response to the Bank's March 15, 2022, complaint, Prince filed a motion to dismiss, pursuant to section 2-619 of the Code (*id.* § 2-619(a)(5)), arguing the action brought against her was time-barred by the applicable statute of limitations. Prince averred that the loan documents bearing her signature did not specify the amount dispersed and accepted, the interest rate, the duration, or the repayment method; thus, the documents were subject to the five-year limitations period stated in section 13-205 of the Code (*id.* § 13-205).

¶ 18    On October 7, 2022, the Bank filed a first amended complaint prior to the court's resolution of Prince's motion to dismiss. The amended pleading asserted three counts of recovery against each of Prince's seven loans: one count of promissory note default, one count of breach of contract, and one count of breach of "other evidences of indebtedness in writing" falling under the 10-year statute of limitations in section 13-206 of the Code (*id.* § 13-206). The court denied Prince's subsequent motion to dismiss. Thereafter, on February 23, 2023, Prince filed an answer to the amended complaint and asserted four affirmative defenses, one of which reiterated her position that the lawsuit was barred by the five-year statute of limitations (see *id.* § 13-205).

¶ 19    The court denied Prince's motion for summary judgment on statute of limitations grounds. The matter proceeded to a bench trial on May 29, 2024. The court entered an order following written closing statements, ruling in favor of the Bank for the balance of the loans. It held that the action was not time-barred because the seven DEAL loans were governed by the 10-year statute

6

of limitations (*id.* § 13-206). The court limited its analysis to whether the loans qualified as "other evidences of indebtedness in writing," noting the Bank "abandoned [its] claims for Promissory Note Default and Breach of Contract." It ruled that the APN incorporated the disclosure statement and found the loan documents adequately stated the essential elements of a promise to pay, including the parties to the agreement, the nature of the transaction, the amount in question, and a reasonable implication of an intention to repay.

¶ 20     This appeal followed.

¶ 21                                II. ANALYSIS

¶ 22     It is uncontested that Prince entered into valid contracts with the Bank through its DEAL student loan program. The parties' dispute centers on which statute of limitations governs the loan recovery action based on the written terms binding their contract. The Bank argues section 13-206 of the Code applies. That section provides in relevant part that "actions on bonds, promissory notes, bills of exchange, written leases, written contracts, or other evidences of indebtedness in writing *** shall be commenced within 10 years next after the cause of action accrued." *Id.* Prince asserts that the loan documents do not qualify as writings recognized under section 13-206; rather, she asserts that section 13-205 is the applicable provision governing the loan documents and that the circuit court erred in ruling that the suit was timely brought. Section 13-205 governs "actions on unwritten contracts" as well as "all civil actions not otherwise provided for" which "shall be commenced within 5 years next after the cause of action accrued." *Id.* § 13-205.

¶ 23     Illinois courts strictly interpret the meaning of written agreements, including written contracts and other evidences of indebtedness in writing, for purposes of the statute of limitations. *Portfolio Acquisitions, L.L.C. v. Feltman*, 391 Ill. App. 3d 642, 647 (2009); *Toth v. Mansell*, 207 Ill. App. 3d 665, 669 (1990). A writing constitutes "other evidence of indebtedness" where its

7

language "may fairly be construed to contain a promise to pay money or contains facts from which the law implies a promise to pay, so long as parol evidence is not necessary to establish any essential elements." *Toth*, 207 Ill. App. 3d at 670. Similarly, a contract is considered written, and section 13-206 will attach to the writing, where the parties and all essential terms are reduced to writing and ascertainable within the instrument. *Portfolio*, 391 Ill. App. 3d at 647; *United Airlines, Inc. v. City of Chicago*, 2011 IL App (1st) 102299, ¶ 20 ("A contract is considered written for statute of limitations purposes where all the essential terms are reduced to writing and ascertainable from the instrument itself."). Where parol evidence is needed to identify the parties or essential terms, however, the writing is deemed unwritten or oral for purposes of statute of limitations, and section 13-205 governs. *Portfolio*, 391 Ill. App. 3d at 647.

¶ 24　　　　The applicability of a statute of limitations over a cause of action presents a question of law subject to *de novo* review. *Travelers Casualty & Surety Co. v. Bowman*, 229 Ill. 2d 461, 466 (2008). Under this standard, we assume the role of the trial court and "perform[ ] the same analysis that the trial court would perform." *Wells Fargo Bank, N.A. v. Norris*, 2017 IL App (3d) 150764, ¶ 19.

¶ 25　　　　　　　　　　　　　　　　A. Promissory Note

¶ 26　　　　Prince initially argues that the loan documents do not comport with the definition of a promissory note as understood within section 13-206. She argues the documents fail on this front for myriad reasons. First, the loans fail to state a fixed amount of money. See 810 ILCS 5/3-104(a) (West 2022). Second, the loans are not payable on demand or at a definite time. See *id.* § 3-104(a)(2). She also asserts that the rights of the borrower are stated in another writing. See *id.* § 3-106(a). Reminiscent of its trial position, the Bank forgoes any argument that the loan documents constitute a promissory note or a written contract for section 13-206 purposes.

8

¶ 27    A promissory note must be payable on demand or at a definite time. *Id.* § 3-104(a)(2). The loans require payment to commence six months after either the student leaves school or he or she falls below half-time enrollment status. The borrower's rights and responsibilities further cap the payment timeline within 10 years of these contingencies. Because the time in which a student leaves school or drops below half-time status is indeterminable at the point in which they execute the APN, the loans do not provide for a definite time of repayment. See *id.* Similarly, the language of the loans does not suggest that they are payable on demand or at sight (see *id.* § 3-108), as payment is conditioned on a change in attendance status. Accordingly, the loan documents are not promissory notes.

¶ 28                    B. Written Contract or Other Evidences of Indebtedness

¶ 29    Prince argues that the loan documents are neither "written contracts" nor "other evidences of indebtedness" for the same reason: the APN fails to adequately state the amount loaned—parol evidence is required to determine the discernible amount disbursed and, later, the amount accepted by the borrower. The Bank responds that the loans are "other evidences of indebtedness" subject to the 10-year limitations period because they contain a promise to pay.

¶ 30    There are four essential elements or terms necessary for a writing to sufficiently state a promise to pay. The writing must identify "(1) the parties to the agreement, (2) the nature of the transaction, (3) the amount in question, and (4) at least a reasonable implication of an intention to repay the debt." *Kranzler v. Saltzman*, 407 Ill. App. 3d 24, 28 (2011).

¶ 31    There is little dispute that the APN by itself satisfies three of the four elements of a promise to pay. Each APN signed by Prince identifies the parties to the agreement, including the Bank as the lender, the Student Loans of North Dakota as the guarantor, and Prince as the borrower. Likewise, the nature of the transaction, as a loan, is self-evident from the title of the loan

9

application, the requested and certified loan amount sections, and explicit language before the signature block providing "THIS IS A LOAN THAT MUST BE REPAID." Prince's reasonable implication of an intention to repay is adequately evidenced by her signature and the promissory language just preceding her signature: "I promise to pay to the lender, or a subsequent holder of this Promissory Note, all sums disbursed (hereinafter 'loan') under the terms of this Note, plus interest and other fees which may become due as provided in this Note."

¶ 32    What remains is a determination on whether the loan documents express "the amount in question" certain enough to state a promise to pay. *Id.* The parties disagree over several contentions relating to this element, including whether a document that does not exist at the time of contracting can be incorporated into an agreement, whether "other evidence of indebtedness" requires an identifiable fixed amount to be paid within the writing, and whether a maximum amount of credit can satisfy the "amount in question" element.

¶ 33    1. Incorporation of a Noncontemporaneous Document

¶ 34    Prince asserts that the disclosure statement, which was generated by the Bank anywhere from 9 to 30 days after the completion of the APN, cannot be incorporated by reference. She reasons that a party cannot agree to undisclosed terms generated post-agreement. She argues she did not assent to the additional terms spelled out in the disclosure statement, due to its creation after the parties agreed to the terms within the APN. Therefore, the supplemental information in the disclosure statement—the loan amount to be disbursed, the interest rate applied to the loan, and the disbursement dates—could not be used to reconcile terms missing from the APN.[2] Prince

---

[2]Prince argues that the Bank's administrative fee subtracted from the disbursement amount to process the loans was a new "term" introduced in the disclosure statements. Without addressing whether the administrative fee is a "term" or is otherwise necessary to establish the "amount in question" element, we must note Prince is incorrect. While the disclosure of terms section in the APN requires a borrower to pay the "administrative fee in an amount identified in the disclosure statement," the APN packet unequivocally identifies that a 4% administrative fee will be charged to the borrower.

10

analogizes other areas of law that have rejected the incorporation of noncontemporaneous documents into agreements, including arbitration agreements (*American United Life Insurance Co. v. Employers Reassurance Corp.*, No. 21 C 1828, 2021 WL 6882140, at *2 (N.D. Ill. June 11, 2021)), and wills (*Keeler v. Merchants Loan & Trust Co.*, 253 Ill. 528, 536 (1912)).

¶ 35     The Bank argues the loan documents were properly incorporated. In support, it analogizes two federal district court decisions to Prince's case: *Eul v. Transworld Systems*, No. 15 C 7755, 2017 WL 1178537, at *8 (N.D. Ill. Mar. 30, 2017), and *Trujillo v. Asset Recovery Solutions, LLC*, No. 17 C 2303, 2017 WL 6816536, at *2 (N.D. Ill. Aug. 9, 2017), which it deems helpful in determining whether the loan documents state a definite "amount in question" by means of incorporation. While we are not bound by lower federal court decisions, they "may be considered persuasive authority." *State ex rel. Leibowitz v. Family Vision Care, LLC*, 2020 IL 124754, ¶ 74.

¶ 36     A fundamental principle of contract law allows for an instrument to " ' "incorporate all or part of another instrument by reference." ' " *Wiczer v. Wojciak*, 2015 IL App (1st) 123753, ¶ 36 (quoting *Unifund CCR Partners v. Shah*, 407 Ill. App. 3d 737, 743 (2011), quoting *Provident Federal Savings & Loan Ass'n v. Realty Centre, Ltd.*, 97 Ill. 2d 187, 192-93 (1983)). To do so, " 'the reference must demonstrate "an intention to incorporate the document and make it part of the contract." ' " *Id.* (quoting *Shah*, 407 Ill. App. 3d at 743, quoting *Arneson v. Board of Trustees*, 210 Ill. App. 3d 844, 849-50 (1991)). If adequately referenced, the incorporated documents will comprise the contract as a whole. *Id.*

¶ 37     The federal decisions identified by the Bank held that, with the aid of incorporated documents, the disputed private student loans were subject to Illinois's 10-year statute of limitations. *Eul*, 2017 WL 1178537, at *10-11; *Trujillo*, 2017 WL 6816536, at *2.

11

¶ 38        In *Eul*, a putative class of private student loan recipients brought a consolidated action against debt holders, debt servicers, and law firms alleging their loan recovery efforts violated certain federal and state laws. *Eul*, 2017 WL 1178537, at *1-2. Defendants collectively moved to dismiss most counts of the complaint. *Id.* at *2. Four representatives of the class made the same argument Prince does here: the original document signed by the borrower does not contain the essential terms necessary to qualify under section 13-206 of the Code. *Id.* at *8, 10; 735 ILCS 5/13-206 (West 2022). Rather, the amount loaned, among other purported omitted terms, was only discernible from parol evidence in the form of a disclosure statement and subsequent course of dealing. *Eul*, 2017 WL 1178537, at *10. The *Eul* court disagreed that the disclosure statement identifying the loan amount was parol evidence, as the credit agreement incorporated the statement by reference. *Id.* Because the documents set forth the essential terms of the agreement, the court concluded that the private loan agreements constituted written contracts under section 13-206 and the 10-year limitations period applied. *Id.* at *11.

¶ 39        Soon after the *Eul* decision, the Northern District of Illinois reached a similar result in *Trujillo* by holding certain student loan documents qualified as " 'other evidences of indebtedness' " that were governed by the 10-year statute of limitations. *Trujillo*, 2017 WL 6816536, at *1-2. In *Trujillo*, the court found the initial document outlining the parties' agreement, a promissory note, adequately referenced the Truth In Lending Act (TILA) (15 U.S.C. § 1601 *et seq.* (2012)) disclosure for incorporation purposes. *Trujillo*, 2017 WL 6816536, *2. Those documents together identified the essential elements of a promise to pay, with the promissory note identifying the parties, nature of the transaction, and the student borrower's express certification to repay, whereas the TILA disclosure detailed the amount in question. *Id.* at *1-2.

¶ 40        Relevant to this appeal, the *Trujillo* court addressed Prince's argument that a document not in existence at the time of the student borrower's signing cannot be incorporated. *Id.* It disagreed and was unpersuaded that the wills context cited to support that principle was "transferrable generally to contracts." *Id.* A Treatise on the Law of Contracts gives credence to *Trujillo*'s holding that, in the contract context, a noncontemporaneous document may be incorporated by reference. 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 30:25 (4th ed. 1999). The treatise outlines the requirements necessary to incorporate a noncontemporaneous document:

> "Generally, all writings which are part of the same transaction are interpreted together. One application of this principle is the situation where the parties have expressed their intention to have one document's provision read into a separate document. So long as the contract makes *clear reference to the document* and *describes it in such terms that its identity may be ascertained beyond doubt*, the parties to a contract may incorporate contractual terms by reference to a separate, *noncontemporaneous* document, including a separate agreement to which they are not parties, and including a separate document which is unsigned. *** [I]n order to uphold the validity of terms incorporated by reference, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms, or, in the case of incorporated terms to be decided upon by one party in the future, there must be an ascertainable standard for promulgation of new terms which is set forth in the original agreement and which can provide a substitute for present knowledge of and assent to subsequently adopted provisions." (Emphases added.) *Id.*

13

¶ 41        Prince's citation to other legal areas that prohibit a noncontemporaneous document's incorporation is unpersuasive and does not usurp permitting the incorporation of noncontemporaneous loan documents. Prince references our supreme court's statement that for adequate incorporation of a document into a will, the document must be "in existence at the time of the execution of the will." (Internal quotation marks omitted.) *Keeler*, 253 Ill. at 535. In construing a will, the primary concern is the testator's intent. *In re Estate of Siedler*, 2019 IL App (5th) 180574, ¶ 22 ("The courts 'always look upon the intention of the testator as the polar star to direct them in the construction of wills.' " (quoting *Orr v. Yates*, 209 Ill. 222, 229 (1904))). A will must be executed in accordance with certain statutory requisites that aid in ensuring the will reflects a testator's intent, *e.g.*, the testator must have sound mind and memory, and the document must be signed by the testator or third person in the presence of the testator at his or her direction and attested to in the presence of the testator by two credible witnesses. 755 ILCS 5/4-1, 4-3 (West 2022). Allowing the incorporation of a document not yet in existence would undermine the formal requirements for the execution of a will.

¶ 42        Prince's reliance on the proscription of incorporating noncontemporaneous rules in arbitration agreements is inapposite. See *American United Life Insurance Co.*, 2021 WL 6882140, at *2. Parties are only allowed to agree to arbitration rules and procedures that existed at the time of contracting, the rationale being that rules and procedures created after the parties' contract could not have been agreed to. See *id.* This general statement does not preclude the incorporation of non-contemporaneous *documents* in all contexts. Indeed, parties entering into a mandatory arbitration clause would be hard-pressed to identify a nonexistent arbitration rule or procedure with enough specificity as A Treatise on the Law of Contracts requires to incorporate noncontemporaneous documents. 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 30:25

14

(4th ed. 1999). To further draw the factual distinction between an arbitration agreement and the student loan setting, entering into an arbitration agreement is typically accomplished through one writing, whereas loan applications and agreements often require the exchange of multiple documents to completely inform the parties of the terms agreed upon. As such, we conclude the cases Prince relies upon to argue noncontemporaneous documents cannot be incorporated are readily distinguishable and not applicable to the case at bar.

¶ 43    In the student loan context, the incorporation of a noncontemporaneous document did not prevent the Kentucky Court of Appeals from holding that analogous loan documents constituted a written contract for statute of limitation purposes under Kentucky state law. *Cornett v. Student Loan Solutions, LLC*, 672 S.W.3d 852, 853-54, 859 (Ky. Ct. App. 2023). In *Cornett*, a student borrower signed a credit agreement that established certain elements of a promise to pay, but did not provide for the correct loan amount, amount due monthly, or origination fee. *Id.* at 857. A corresponding unsigned disclosure statement provided for additional loan terms but was created 11 days after the student borrower entered into the credit agreement. *Id.* at 854. While the student borrower argued that she did not receive the disclosure statement, the court nonetheless found that the statement was plainly incorporated by reference and, together with the credit agreement, set forth the essential terms of the loan. *Id.* at 859.

¶ 44    Here, akin to *Eul* and *Trujillo*, the APN expressly incorporates the disclosure statement by reference. The reverse side of the APN's triplicate form provides "[a]t or before the time of my first disbursement, the lender will send me a disclosure statement identifying additional terms of the loan." The full title of the disclosure statement, the Notice of Loan Guarantee and Disclosure Statement, is listed in the pamphlet pages, the instructions for completing the application, and the borrower's rights and responsibilities page, which was likewise referenced on the reverse side of

15

the APN. Furthermore, various sections of the application relay to the reader what supplemental information to expect within the disclosure statement, including the grace period length, interest rate, and loan amount. The APN clearly references the disclosure statement and describes it in a way in which its identity may be ascertained beyond doubt. See 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 30:25 (4th ed. 1999).

¶ 45    The Bank points out that the term "disbursement" is addressed throughout the APN. We note here, however, that the APN does not mention the disbursement letter. A general reference to the act of disbursing does not sufficiently refer to or describe the disbursement letter. As such, the disbursement letter was not incorporated into the loan documents.

¶ 46    We briefly address Prince's argument that permitting the disclosure statement's incorporation runs afoul the rejection of the "composite document theory" in *Portfolio*, 391 Ill. App. 3d at 655. Prince misunderstands *Portfolio*'s holding concerning the composite document theory. There, the plaintiff debt collector brought an action to recover defendant's credit card debts. *Id.* at 644-45. It attached disparate documents to its second amended complaint, including defendant's signed application for the credit card, copies of cardholder agreements, and account statements from five years after the application. *Id.* at 646. The First District held that section 13-205 applied to the debt collector's action to recover on the credit card contract. *Id.* at 652. The debt collector's attempt to have the court consider the documentation together and invoke the composite document theory, so as to "prove the existence of a writing through all documentation surrounding the transaction," was in error. *Id.* at 655. As the court explained, the theory was hardly a trending development and, when employed, was utilized in the context of resolving the existence of a contract, which was not at issue. *Id.* Here, like in *Portfolio*, the issue before us is not whether a contract exists between the parties, but whether their agreement is in "writing." See *id.* As such,

16

we are not confronted with the composite document theory, and it is not implicated because the disclosure statement is incorporated, making it "as much a part of" the APN as if its contents had been "expressly written in it" (internal quotation marks omitted) (*Eul*, 2017 WL 1178537, at *10), whereas the disbursement letter is not incorporated.

¶ 47                                     2. Amount in Question

¶ 48        Having determined that the disclosure statement is properly incorporated, we turn to the separate issue of whether the APN and disclosure statement considered together indicate the "amount in question" sufficient for a promise to pay. Prince argues that to satisfy this element, loans are required to state the fixed amount that she must pay, and neither the APN nor the disclosure statement indicate that amount. In fact, none of the loan documents that the Bank purportedly provided her, including the disbursement letters, offer a fixed payment amount required for "writings" recognized in section 13-206. According to Prince, the APN merely contained the requested loan amount, the disclosure statement contained the disbursement amount approved, and the disbursement notices only contained the amounts sent to her university that were subject to rejection.

¶ 49        The Bank asserts that the "amount in question" element is satisfied by the disclosure statement's incorporation. It proposes that the disclosure statement "shows the amount of funding" it would "ultimately send to Prince's school."

¶ 50        Courts have not squarely addressed what must be reflected in a writing to satisfy the "amount in question" element. The explicit identification of sums—whether in a handwritten obligation on the reverse side of a promissory note (*In re Estate of Garrett*, 24 Ill. App. 3d 895, 897-98 (1975)), in a typewritten memo (*Kranzler*, 407 Ill. App. 3d at 26, 29-30), or in a text message (*In re Kubin*, No: 18-02853, 2022 WL 1467643, at *7 (Bankr. N.D. Ill. May 9, 2022))—

17

unquestionably suffice. The *Eul* and *Trujillo* courts held that this element was satisfied where the amount loaned to the student borrower was reflected within the incorporated loan documents. *Eul*, 2017 WL 1178537, at *10; *Trujillo*, 2017 WL 6816536, at *2. Intuitively, the inverse fails to satisfy this element; a writing that excludes the amount altogether is insufficient. *Ramirez v. AP Account Services, LLC*, No. 16-cv-2772, 2017 WL 25179, at *3 (N.D. Ill. Jan. 3, 2017) (finding a credit union's member handbook did not list the amount of debt at issue and therefore failed the "amount in question" element).

¶ 51 At least in one context, the omission of an amount owed was not preclusive in finding section 13-206 applied to a writing. In *Blanchard & Associates v. Lupin Pharmaceuticals, Inc.*, 900 F.3d 917, 919-20, 922 (7th Cir. 2018), the Seventh Circuit held that a law firm's engagement letter to its pharmaceutical client was a written contract under Illinois limitation law. This was true despite the client's contention that the letter failed to identify the amount in question which, according to the law firm's complaint, was $120,835 in unpaid legal fees. *Id.* at 920, 923. In repudiating that argument, the court found that the listing of the firm's hourly rates in the letter established "the amount in question to the degree necessary for a suit on a written contract." *Id.* at 923.

¶ 52 With these cases in mind, we address the APN and disclosure statement and conclude that they satisfy the "amount in question" element of a promise to pay. Thus, they constitute "other evidences of indebtedness," bringing the transaction within the 10-year limitation period prescribed by section 13-206.

¶ 53 Although arising out of a different procedural posture, we find *Eul* and *Trujillo* both persuasive and akin to the scenario before this court. In relevant part, those cases involved actions in which student loan borrowers or guarantors claimed lenders violated the Fair Debt Collection

Practices Act (15 U.S.C. § 1692 (2006)) by attempting to collect debts after the expiration of the five-year limitations period plaintiffs alleged applied. *Eul*, 2017 WL 1178537, at *4; *Trujillo*, 2017 WL 6816536, at *1. The lenders moved to dismiss the complaints, asserting the 10-year limitation of section 13-206 of the Code applied rather than the 5-year period of section 13-205. *Eul*, 2017 WL 1178537, at *7-10; *Trujillo*, 2017 WL 6816536, at *1-2.

¶ 54 As noted above, the *Eul* court found that the credit agreement specifically incorporated the terms of the disclosure statement. *Eul*, 2017 WL 1178537, at *10. Like the documents before this court, only the credit agreement was signed by the borrower and designated the "Loan Amount Requested" in a near identical manner to that contained in the APN executed by Prince. *Id.* at *9. Moreover, the *Eul* court found that the incorporated disclosure statement was not parol evidence and set forth the amount actually loaned in the same manner as the disclosure statements in evidence here. *Id.* at *10.

¶ 55 Similarly, *Trujillo* concluded that the promissory note satisfied three of the four elements of a promise to pay required to establish "other evidences of indebtedness" and the incorporated TILA disclosure, which is equivalent to the disclosure statements before this court, established the "amount in question." *Trujillo*, 2017 WL 6816536, at *1-2. Such were the findings of the circuit court in this matter. We agree.

¶ 56 Prince analogizes her loan agreements to the revolving credit card transactions that were found to be neither written contracts nor other evidences of indebtedness in *Portfolio*, 391 Ill. App. 3d at 652, 654. This type of transaction was recently addressed by the First District, which concluded that a revolving equity line of credit failed to establish the "amount in question" element. *BMO Bank N.A. v. Zbroszczyk*, 2025 IL App (1st) 241333, ¶¶ 40-41. In *Zbroszczyk*, the plaintiff bank brought a foreclosure action based upon an " 'Equity Line Credit Agreement and

19

Disclosure,' " executed by the bank and a homeowner, that contained a $100,000 credit limit. *Id.* ¶¶ 1, 4. The court rejected a contention that this credit limit established the "amount in question," as the agreement did "not set forth a definite fixed sum that defendant was obligated to pay." See *id.* ¶ 40.

¶ 57        *Zbroszczyk* makes plain that "revolving credit loans" do not satisfy the amount in question. *Id.* ¶¶ 31-32, 40-41. The student loans here do not involve a revolving credit loan. Rather, the Bank sought to lend a certain amount that Prince was obligated to repay. See *id.* ¶ 41 (defining the Equity Line Credit Agreement and Disclosure as "not the type of agreement in which defendant was provided a certain sum of money that he was obligated to repay over time"); see also *Eul*, 2017 WL 1178537, at *11 (explaining the student loan agreements were fundamentally different from the revolving credit line transactions in *Portfolio*). Irrespective of this distinction, in order to satisfy the "amount in question" element of a promise to pay, these agreements require the same information to be in writing. Compare *Zbroszczyk*, 2025 IL App (1st) 241333, ¶¶ 40-41 (failing to set forth a definite fixed sum of borrower's obligation subjected agreement to section 13-205's five-year limitation), with *Eul*, 2017 WL 1178537, at *10 ("[T]he amount actually loaned is in writing and does not require parol evidence to ascertain."), and *Trujillo*, 2017 WL 6816536, at *2 ("Parol evidence, however, is not required here given that the Disclosure contains the amount loaned."). We hold that, under a strict interpretation of writings for statute of limitations purposes, the parties' agreement must reflect, in writing, a fixed sum that a borrower was obligated to pay in order to satisfy the "amount in question" element for a promise to pay.

¶ 58        The APN and disclosure statement before this court satisfy the amount in question element. As such, the transactions at issue are subject to the 10-year limitations period set forth in section 13-206. We note that Prince does not suggest she rejected or otherwise did not receive the amount

20

of the loans that were disclosed in the APN and disclosure statement. Rather, for each of her agreements, she asserts, first, that the APN does not establish the amount in question element and the disclosure statement should not be considered at all and, second, that parol evidence is required to determine the amount she was actually loaned. Having concluded that the APN incorporated the disclosure statement, that argument cannot carry the day. Lastly, even had she denied receipt of the funds, parol evidence is permitted to establish delivery of a writing and its acceptance and adoption by a party, without taking the written agreement outside the realm of a writing governed by a 10-year limitations period. See *Stanley v. Chastek*, 34 Ill. App. 2d 220, 236 (1962); see also *Memory v. Niepert*, 131 Ill. 623, 631-32 (1890).

¶ 59                                   III. CONCLUSION

¶ 60         The judgment of the circuit court of Du Page County is affirmed.

¶ 61         Affirmed.

21

*State of North Dakota v. Prince*, 2025 IL App (3d) 240514

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 22-LA-258; the Hon. Neal W. Cerne, Judge, presiding. |
| **Attorneys for Appellant:** | Daniel A. Edelman and Heather Kolbus, of Edelman, Combs, Latturner & Goodwin, LLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | C. Anthony Crnic, Brian Sayer, and Eileen Love, of The Sayer Law Group, P.C., of Waterloo, Iowa, for appellee. |